1  TIMOTHY S. THIMESCH, Esq., No. 148213
   *tim@thimeschlaw.com*
2  GENE FARBER, ESQ. – Of Counsel – No. 44215
   *genefarber@gmail.com*
3  4413 Prairie Willow Ct.
   Concord, CA 94521-4440
4  Tel: 925/588-0401
   Fax: 888/210-8868
5
   Attorneys for Plaintiff FRANCISCA MORALEZ
6

7

8                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9

10  FRANCISCA MORALEZ,                    Case No. 3:22-cv-07540-SK
                                          Civil Rights
11              Plaintiff,

12  vs.

13  MONTEREY PLAZA HOTEL LIMITED
    PARTNERSHIP, et al,
14

15              Defendants.

16

17

18

19  _____/

20

21

22  **DECLARATION OF JOHN D. O'CONNOR IN SUPPORT OF PLAINTIFF'S MOTION
       FOR AN AWARD OF REASONABLE STATUTORY ATTORNEY'S FEES,
23     LITIGATION EXPENSES, AND COSTS AGAINST DEFENDANT CITY OF
                              MONTEREY**

24

25

26

27

28

---

**Declaration of John O'Connor Supporting Plaintiff's Motion for Fees, Expenses, and Costs
Against the City of Monterey: Case No. 3:22-cv-07540-SK**

# DECLARATION OF JOHN D. O'CONNOR

I, John D. O'Connor, do hereby declare as follows:

## I. EDUCATION, EXPERIENCE, AND WORK HISTORY

1. I am an attorney licensed to practice law in all courts in the State of California and have been so licensed since December 1972. I am currently the principal of O'Connor and Associates, a law firm consisting of me and several associates that specializes in commercial litigation. I have fifty-three years of significant trial experience, including current jury trial experience. In addition to my litigation practice, I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions.

2. The following is a summary of my background and qualifications.

3. I attended The University of Notre Dame in South Bend, Indiana, where I graduated *magna cum laude* in 1968. In 1972, I graduated *cum laude* from the University of Michigan Law School, where I was a member of the *Order of the Coif* and Associate Editor of the Michigan Law Review. I was admitted to the California bar in 1972.

4. After being admitted to the California bar, I held numerous positions at private law firms where my practice focused on trial litigation. In 1972 and 1973, I was an associate with the trial firm of Belli, Ashe, and Choulos, where I assisted Mr. Melvin Belli in the trial of several large cases and tried three cases on my own. From January 1974 through December 1979, I was an Assistant United States Attorney for the Northern District of California in San Francisco. In that capacity, I tried white-collar criminal cases as well as a variety of civil matters.  Much of my civil work with the U.S. Attorney's office involved employment discrimination cases brought against Government facilities, including one class action race and discrimination case, which involved negotiating fees for thirteen lawyers.  In 1980 and 1981, I was a senior associate at the prominent San Francisco firm of Brobeck, Phleger, and Harrison.

**DECLARATION OF JOHN D. O'CONNOR**    1

5. From 1982 through 2001, I was a principal and managing partner of the law firm of Tarkington, O'Connor & O'Neill, where our clients were mainly insurance companies, corporate risk management departments, and governmental entities, such as the FDIC, FSLIC, RTC, NCUA, and the United States government.

6. From 2001 through 2006, I was Special Counsel and a Director (equivalent in a legal corporation to a partner) for the Howard Rice firm, now merged with Arnold and Porter, practicing within the litigation department. At Howard Rice, I pursued a high-stakes litigation practice, including the defense of R. J. Reynolds Tobacco Company and intellectual property disputes. At Howard Rice, I was designated as chief trial counsel in two major "soft IP" litigations, each case involving the scope of rights transferred under certain contractual arrangements, one representing an e-commerce platform provider and another representing Vivendi regarding the scope of rights to license video games in internet café settings.

7. Since July 2006, I have practiced on my own with several associates under the name of O'Connor and Associates. My practice continues to focus on complex business litigation, with some personal injury work for both plaintiff and defense, including an active trial practice. In my career, I have tried over seventy civil and criminal cases in state and federal jurisdictions throughout the country. Approximately one-third of my time has been spent as a consultant and expert witness in attorney fee disputes. In such disputes, I have assisted parties seeking fees and those seeking to oppose or reduce them.

8. In 1982, I began managing the Tarkington office, and as our firm quickly grew to over eighty lawyers, I regularly kept abreast of billing standards in the community and regularly subscribed to specialized publications geared to law firm management, such as the Altman and Weil annual reports and the monthly published Partners' Report. I also regularly reviewed more widely published legal periodicals.

9. As written billing guidelines became in vogue for institutional clients in the mid-eighties, I participated heavily in working with our institutional clients in government,

insurance, and other large businesses to establish and implement practical billing standards. I regularly consulted with these clients about their perception of the positive and negative in our billings and, where appropriate, remedied the same.

10. I have kept abreast of the billing rates in both Northern and Southern California, and generally throughout the country since 1982. Because we represented clientele in different business and governmental sectors, it was important to me to be conversant about rates throughout the litigation field ranging from premium to lower, more commoditized rates.

11. Because our practice at the Tarkington firm often involved coverage, legal malpractice, and reinsurance and excess monitoring work, we reviewed the billings of a wide variety of firms in our regular practice, including premium-rate billings, lower, highly negotiated insurance defense charges, and standard business litigation charges with rates falling between these two groups.

12. Although I have been involved in a significant amount of legal fee review, negotiation, and litigation since 1977, my involvement in legal fee dispute work increased significantly in 1989. In that year, I was the Tarkington partner in charge of our work with failed and failing financial institutions on behalf of the FDIC, FSLIC, RTC, and NCUA. At that time, we had performed extensive work in connection with the failed Golden Valley Bank, Turlock, California (then in Receivership under the aegis of the FDIC). The insurance carrier for the bank insisted that we advise the government to release the insurance carrier from its defense obligations with a nominal payment. After our refusal, the insurance company subjected the Receiver and our firm to numerous audits in an unsuccessful attempt to force the government to release the carrier from its obligations. At this point, I necessarily became immersed in the various billing standards prevalent in the community.

13. During these years of legal fee disputes, I spent much of my time dealing with the developing field of legal "auditing" and related litigation. As a result, I gained a wide knowledge of auditing practices, prevailing billing standards, and approaches employed by

**DECLARATION OF JOHN D. O'CONNOR**    3

legal fee experts, auditors, and litigators.

14. Due to my growing expertise in legal fee and auditing issues, during the years 1991 through 2001, I consulted with numerous law firms throughout the country who were seeking my advice on audit criticisms leveled against their practices, almost invariably involved in large fee disputes. I also consulted on numerous occasions with fee payors in fee disputes. I continue this work as a subspecialty of my litigation practice through the present time.

15. I have been retained as an attorney fee expert on approximately three hundred occasions and have served as a consulting expert on many more occasions. A significant portion of those cases have been large and complex.

16. In total, I have testified as an expert or handled litigation in approximately twenty states. I regularly review published rate surveys, generally broken down by location, fields of practice, size of firm, and status of lawyer. For the past several years, I have also been consulting and lecturing nationwide through the auspices of the National Association of Legal Fee Analysis ("NALFA"). In addition to lecturing myself, I have attended numerous lectures of legal fee analysts, expert witnesses, and general counsel on fee matters. I have had the honor of being named by NALFA the "nation's top attorney fee expert" since 2017.

17. My *Curriculum Vitae* is attached hereto as **Exhibit A**.

18. I have litigated ADA cases myself, although I have never specialized in that area, and do not consider myself a highly qualified practitioner.

19. I have, however, as an expert witness, examined numerous cases involving ADA litigation and the qualifications of lawyers involved in that practice area. From this work, I understand the segregation into various challenges of this litigation and the skill levels needed of litigating lawyers to advocate in that particular segment of ADA litigation effectively.

20. In this case, I have examined the Second Amended Complaint; Answer of City;

**DECLARATION OF JOHN D. O'CONNOR**   4

Consent Decree Order and Judgment vs. City of Monterey; Order to Show Cause vs. Defendant; Plaintiff's Response to Order to Show Cause; General Order 56; Declaration of Gene Farber; Plaintiff's draft of Memorandum in Support of Motion for Attorney's Fees and the Declarations of Timothy Thimesch, Dennis E. Blum, Diane Josephs, Sidney Wolinsky, Guy Wallace, Paul Rein, John Burris, Anthony Goldsmith, and Celia McGuiness in support thereof. Also, I have examined the Martindale-Hubbell rating of Gene Farber.

21. As a result of the foregoing, I believe I am competent to render expert opinions about the reasonableness of the billings in this case.

## II. OPINIONS

22. My primary task, for which petitioning counsel have retained me, is to opine on their hourly rates, specifically $1,000 per hour for both Messrs. Thimesch and Farber.

23. In my opinion, from the particular legal market involved and the skills of these two lawyers, this rate is highly reasonable for each of them.

24. Let me cite the well-accepted standard formulation for calculating a reasonable hourly rate to be included in the appropriate lodestar. (*See, Blum v. Stenson* (1984) 465 U.S. 886, 895, fn. 11 [hourly rates are reasonable if "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."].)

25. There are two components here to consider regarding rates. First, what are the rates for lawyers with "similar skill, experience, and reputation?" Secondly, what is the appropriate "legal market?"

26. In this case, the two questions are intertwined because the skill levels needed for this litigation also properly define the market in which rates should be assessed.

27. I know well, as part of my experience as a litigator in the Bay Area for fifty-three years, the capabilities of Gene Farber. I defended in and around 1974-75, as an Assistant United States Attorney for the Northern District of California, a serious challenge to the then-

named Federal Energy Administration (now Department of Energy) because of the 1974 Arab Oil Embargo and subsequent regulatory actions.

28. Mr. Farber secured a significant victory against the government for a gasoline wholesaler operating in both Northern and Southern California, despite vigorous federal opposition due to the importance of the challenge.

29. Mr. Farber was highly skilled fifty years ago in challenges to governmental action. In my opinion, he is more skillful today.

30. Mr. Thimesch is a highly experienced ADA litigator, dealing primarily with complex issues that most ADA practitioners eschew and that most have little skill or ability to litigate.

31. Per my observations of these attorneys and the excellent results they have achieved in this case and throughout their careers, and based on my consideration of the attorney declarations supporting this motion, these are lawyers of exceptional skill, experience, and reputation, practicing at the highest levels of ADA litigation.

32. What is the appropriate legal market? Part of the definition of the legal market concerns geography. Some legal markets are strictly local, confined to the venue or a particular courthouse involved. One obvious example would be smaller domestic and marital dissolution disputes in which case the market is the particular county of venue. In contrast, for a high-net-worth dissolution, especially one involving the valuation of illiquid assets, the market is at least state-wide, if not national.

33. Often, the contours of a market depend on the skill level needed and the relative rarity of lawyers skilled and experienced in that particular type of litigation.

34. For a complex ADA case such as this, the legal service market certainly extends to San Francisco and San Jose, if not to Los Angeles.

35. Because the area of ADA work here is especially nuanced and arcane, the rates of mass-filing, high-volume "barriers" lawyers, such as the former Potter Handy firm, are

DECLARATION OF JOHN D. O'CONNOR   6

inapplicable. These services are largely rote and not demanding, thus deserving of at best median rates in the larger general market.

36. This case was of unusual complexity and not within the capabilities of most firms doing "barriers" ADA work—the investigation, prior to filing, involved lengthy consultations with three consultants. The Second Amended Complaint listed 139 pages of barriers. There was a serious defense that many of the repairs, if not all, were "not readily achievable."

37. Plaintiffs needed to obtain 60,000 documents from seven different governmental agencies, as well as from the City, including massive complex blueprints. Plaintiffs were forced to make detailed disclosures involving 20,000 pages. The Plaintiffs appropriately investigated the past thirty years of resurfacing evidence. They also investigated new construction and alterations in past years.

38. Another complexity was the obstruction of the owner of 300 LLC. The issues in turn were quite complex. They included the necessity for Environmental Impact Reports; extraordinarily complex surveying issues; investigation and analysis as to the necessity for a City vote; litigation over the hardship exception; and investigation into the ownership of submerged land. Work involved massive, detailed inspections. There were serious issues regarding passenger loading zones, as well as complex issues of joint and several liability between and among various owners, lessees, and lessors.

39. A comparable firm in what is a select coterie of lawyers is the firm of Crumley Roberts. I have worked with that firm on challenging issues related to gas station and convenience store architecture, and I am aware that the firm's skills are comparable to those of the instant lawyers.

40. In my opinion, the partners in that firm are worth, and deserve, over $1,200 per hour. The rates sought here are slightly lower than those of comparable lawyers and are therefore extremely reasonable.

**DECLARATION OF JOHN D. O'CONNOR     7**

41.     One way to gauge the market is by reference to the Real Rate Report ("RRR") published by Wolters Kluwer's ELM Solutions and CEB, which examines anonymous data sourced from legal invoices that were actually billed to clients and sets forth hourly rates based on various criteria, including location, experience, position, whether the matter involved litigation, and practice area.  The Real Rate Report's data sources include those law firms and corporations that use Wolters Kluwer's ELM Solutions software, as well as non-users who voluntarily contribute data in exchange for complimentary copies of reports for as long as they contribute data.  The Real Rate Report is highly respected and has been recognized by courts as a reliable resource:

> Because the Real Rate Report "identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than eighty companies," it provides "a much better reflection of true market rates than self-reported rates in all practice areas."

(*Donastorg v. City of Ont.*, 2021 U.S.Dist.LEXIS 246890, at *19-20 (C.D.Cal. Sep. 23, 2021).)  I have attached hereto as **Exhibit B** reflecting San Francsico and San Jose litigation partner rates.

42.     The RRR for 2024, the most recent survey available, reflects a third quartile litigation partner rate in San Francisco of $1,208 per hour and the San Jose cohort as a third quartile rate of $1,303 per hour.  San Francisco litigation partners command a median rate of $825 and San Jose litigation partners have a command rate of $830.

43.     While I opine that third quartile rates would be warranted herein, counsel's rates are well below the third quartile rates. Clearly, rates of $1,000 per hour, which fall within the middle of the range of median and third quartile rates, and somewhat above the mean, are reasonable.

44.     Another comparator in a parallel market is Ms. Lisa Peck of Monterey.  In a recent civil rights employment case in Alameda County *Qiqiuia Young et al v. The Leland*

**DECLARATION OF JOHN D. O'CONNOR**     8

1  *Stanford Junior University et al*, Case No. RG17877051, in which I was involved as an expert,
2  the Court awarded Ms. Peck's firm a rate of $1,050, blending her rate of $1,200 with that of her
3  senior counsels at $850 per hour.
4      45.    In excellent regional and local boutique firms, rates of $900 to $1,250 per hour
5  are a standard range for partners. In contrast, national, premium-rate firms specify rates of
6  $1,000 per hour for the lowest junior partners to over $2,000 per hour for senior partners.
7      46.    In my opinion, there is no question that the rates of $1,000 per hour in this
8  litigation are appropriate and reasonable for Mr. Farber and Mr. Thimesch, given the skill and
9  nuance involved, against capable City and Hotel opposition.
10      I declare under penalty of perjury that the foregoing is true and correct. Executed this
11  5th day of June 2025 in Marin County, California.

_____
John D. O'Connor

DECLARATION OF JOHN D. O'CONNOR   9

# Exhibit A



4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
T: 415-693-9960 / F: 415-692-6537 / www.joclaw.com



**JOHN D. O'CONNOR**
Phone:  415-693-9960
Direct:  415-464-6250
Mobile: 415-999-2528
john@joclaw.com

*CURRICULUM VITAE*

**Education**

University of Michigan Law School, *cum laude* – Juris Doctorate, 1972

- Member, Michigan Law Review (1970-1972), Associate Editor (1971-1972)
- Member, *Order of the Coif* (1971-72)
- Winner of three AmJur awards as the most outstanding student in a subject.

University of Notre Dame, *magna cum laude* – A.B., 1968

**Work Experience**

Associate, Belli, Ashe & Choulos – 1972-1973

- Dealt with assessing and negotiating "splits" with other attorneys of contingency fees; pursued complex tort and class action litigation; significant trial experience

U.S. Attorney's Office, Criminal and Civil Divisions – 1974-1979

- Dealt with attorney fees, "fee-shifting" civil rights cases; assessed, negotiated, and litigated attorney fees in both individual cases and class action cases; litigated Saunders v. NARF in the Northern District of California and the 9th Circuit; significant trial experience

Senior Associate, Brobeck, Phleger and Harrison – 1980-1981

- Working for prestigious litigation firm, learned staffing and billing procedures and protocols for large commercial and insurance cases

Managing Partner, Tarkington, O'Connor and O'Neill – 1982-2000

- Managing partner responsible for all firm billings
- Supervised billing seminars for newly graduated and recently hired lawyers within firm
- Kept current both with hourly fees charged in the community and billing protocols for various firms and cases throughout the area

- Subscribed to various periodicals such as <u>Partners Report</u> and <u>Altman Weil</u> annual reports
- Consulted with insurance executives regarding billing procedures for their companies
- Consulted with insurance claims executives regarding CUMIS issues including billing rates for various types of litigation throughout the Bay Area
- Worked with various government agencies, such as FDIC, FLIC, NCUA, and RTC regarding appropriate billing protocols, and discussed bills with government officials regarding compliance; Dealt with governmental auditors regarding same
- Consulted with insurance executives regarding CUMIS issues; was resource for those executives negotiating CUMIS fees with independent counsel
- Represented numerous entities including governmental entities, in attorney fees litigation (e.g. in the Sonoma County jail class action litigation, litigated the fees of Heller Ehrman in a fee-shifting civil rights context)
- Defended legal malpractice cases and examined legal malpractice and other professional liability cases for clients, including the conservators and receivers of failed and failing financial institutions
- Interacted with legal counsel and claims executives for governmental and insurance clients in review and analysis of firm billings
- Kept current on hourly rates charged in various litigation sectors in both Northern and Southern California; per assignments, in selected areas of the country
- Dealt with <u>Brandt</u> fee issues both as a plaintiff and defendant in insurance coverage cases
- Reviewed bills of firms in underlying cases while representing insurers, reinsurers and access carriers
- Significant work regarding legal fee auditing and litigation regarding legal fees and legal fee auditing, detailed below

Director (Partner) and Special Counsel, Howard Rice – 2001-2006
- Regularly apprised of market rates of competing law firms, as firm annually reset its rates
- Acquired knowledge of total fees charged on various complex cases, both by the Howard Rice firm, now merged with Arnold and Porter, and others
- Named arbitrator on 3-arbitrator JAMS panel regarding over $2,000,000 of asbestos billings; heard and evaluated testimony of competing fee experts and auditors

Principal, O'Connor and Associates – 2006-Present
- Expert witness and consultant, legal fees and litigation management
- Member, National Associations of Legal Fee Analysis
- Lecturer on Attorney Fees on nationwide webinars, NALFA and other organizations
- Named as the "Nation's Top Attorney Fee Expert" by NALFA for the years 2017 through 2024
- Accepted as an expert witness in over 300 cases throughout California and the country
- Continues a litigation career with over 80 trials in federal and state courts throughout the country, enabling fee opinions based on experience

**Overview of Services**

John D. O'Connor offers expert consultant services in a variety of attorney fee and litigation management contexts. He is regularly employed as both an expert and litigator in attorney fee disputes, and as a confidential fee consultant. His services often involve an analysis of the skill and efficiency of attorneys in litigation and litigation management.

**Background and Qualifications**

John O'Connor has over 50 years of experience in a wide variety of litigation matters, ranging from personal injury to civil rights and employment to complex business cases. A significant part of that experience is the trial of over 80 cases in both state and federal Courts throughout the country, and the preparation for and settlement of many more, as well as a substantial number of arbitrations. Additionally, for 20 years, O'Connor functioned as managing partner of a substantial litigation firm. His law firm experience includes partnerships in small boutique firms, a substantial mid- sized firm, and larger nationally known firms.

A significant portion of his work for over 40 years has been the evaluation, litigation and resolution of attorney fee issues. First as an Assistant United States Attorney, and later representing county and municipal governments, O'Connor has represented potential fee payors under "fee shifting" statutes.  He, as well, has worked extensively for fee petitioners.

As a private lawyer for federal government agencies during the financial institutions crises of the 1980's and 90's, and as well working with a variety of insurers and self-insurers, O'Connor has worked to develop with the client, and implement on behalf of his law firm, sophisticated billing guidelines. O'Connor has worked with many clients in mutually cooperative fashion to examine firm billings, assure compliance and rectify shortcomings.

Since the advent in the late 1980's of adversarial legal auditing, O'Connor has served extensively as both an expert and litigator analyzing audit criticisms, applying community standards, and construing applicable case law. In this context, O'Connor has consulted on hundreds of adversarial legal fee disputes over three decades. He has as well served as JAMS mediator, a litigator representing both law firms and fee payors on fee issues, and an expert witness both through written Declaration and oral testimony.

# Exhibit B

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2024 - Real Rates for Associate and Partner**  **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2024 | 2023 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| San Diego CA | Litigation | Partner | 43 | $252 | $400 | $907 | $568 | $539 | $550 |
| | | Associate | 44 | $195 | $250 | $343 | $315 | $303 | $303 |
| | Non-Litigation | Partner | 75 | $401 | $523 | $889 | $678 | $676 | $717 |
| | | Associate | 57 | $250 | $374 | $458 | $412 | $393 | $378 |
| San Francisco CA | Litigation | Partner | 166 | $420 | $825 | $1,208 | $856 | $821 | $760 |
| | | Associate | 120 | $431 | $614 | $824 | $659 | $606 | $534 |
| | Non-Litigation | Partner | 220 | $460 | $770 | $1,172 | $838 | $832 | $790 |
| | | Associate | 167 | $342 | $575 | $860 | $625 | $578 | $566 |
| San Jose CA | Litigation | Partner | 36 | $650 | $830 | $1,303 | $996 | $990 | $899 |
| | | Associate | 29 | $497 | $640 | $833 | $682 | $678 | $674 |
| | Non-Litigation | Partner | 57 | $703 | $931 | $1,350 | $1,069 | $1,097 | $1,046 |
| | | Associate | 46 | $474 | $600 | $1,055 | $752 | $759 | $637 |